IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 21–34–M–DWM |
| Plaintiff, | |
| vs. | OPINION and ORDER |
| NOAH ALEXANDER VAN PELT, | |
| Defendant. | |

The motion to suppress evidence which defendant seeks in this case exemplifies the tension that exists between the obligations of law enforcement officers, their duties to the public, and the protections afforded any individual by virtue of the Fourth Amendment's warrant requirement. The Fourth Amendment requires a warrant before law enforcement officers conduct a search. But that seemingly simple legal notion is not so simple. The shroud of interpretive smog concerning the Fourth Amendment is replete with multiple exceptions that the government argues apply to the search here: exigent circumstances, plain view, and inevitable discovery, among others. As Lewis Carroll noted in *Through the Looking Glass*, "When I use a word, it means just what I choose it to mean—

1

nothing more nor less." Applying exceptions to the Fourth Amendment in light of the record means only what the court says it means, as interpreted by the Supreme Court and the Ninth Circuit, "nothing more nor less." Ultimately the application of any or all those exceptions is tantamount to the "Humpty Dumpty" rule of meaning—or, determining what is reasonable in applying the Fourth Amendment to the circumstances here means trying to ferret out what is reasonable when police are called to assist in a medical emergency caused by an overdose of unknown drugs and the parameters of searching without a warrant under those facts. In this case the search was reasonable as explained below.

The defendant, Noah Alexander Van Pelt, faces two criminal counts: prohibited person in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) ("Count I") and in violation of 18 U.S.C. § 922(g)(3) ("Count II"). (Doc. 1.) He also faces a forfeiture allegation under 18 U.S.C. § 924(d). Van Pelt now seeks to suppress the evidence of illegal drugs and a gun discovered at his home and his subsequent statement to his state probation officer. (Doc. 13.) A suppression hearing was held on October 28, 2021, and the government called four law enforcement witnesses. Based on the record and the evidence presented at the hearing, the search was reasonable and the motion to suppress is denied. The "fruit of the poisonous tree" does not apply to Van Pelt's statement to his probation officer nor was she required to Mirandize him.

2

**BACKGROUND**

## I.     Van Pelt's Criminal History

In February 2019, Van Pelt was convicted of criminal endangerment under Montana law and sentenced to a term of imprisonment greater than one year. (Doc. 13-5 at 2.)  A condition of Van Pelt's supervision states: "Defendant must make the residence open and available to an officer for a home visit or for a search upon reasonable suspicion."  (*Id.* at ¶ 2.)  The conditions also state that "Defendant is prohibited from using, owning, possessing, transferring, or controlling any firearm, ammunition (including black powder), weapon, or chemical agent such as oleoresin capsicum or pepper spray."  (*Id.* ¶ 6.)  And,

> Upon reasonable suspicion that the Defendant has violated the conditions of supervision, a probation and parole officer may search the person, vehicle, residence of the Defendant, and the Defendant must submit to such search.  A probation and parole officer may authorize a law enforcement agency to conduct a search, provided the probation and parole officer determines reasonable suspicion exists that the Defendant has violated the conditions of supervision.

(*Id.* ¶ 8.)  Additionally, Van Pelt "is prohibited from using or possessing alcoholic beverages and illegal drugs."  (*Id.* ¶ 10.)  He is also required to report any arrest or contact with law enforcement to his probation officer within 72 hours.  (*Id.* ¶ 9.)

## II.    Events Underlying this Search

Late on March 6, 2021, a woman called 911 to report that her roommate, who was ultimately identified as Van Pelt, was "making gargling noises" in the

bathroom.  (*See* Doc. 13-1 at 1; Doc. 16-2 at 1.)  While on the phone, the caller

went into the bathroom to investigate the noises and reported that Van Pelt's "eyes

weren't open," he "was pale," and she "th[ought] it might be an overdose."  (Doc.

16-1.)  Missoula Police Department Officers Noah Champa and Garrett Brown

were dispatched to the address to investigate the report.  (Doc. 13-1 at 1; Doc. 13-2

at 2.)  Brown was assigned to Champa as his "trainee."  (Doc. 13-1 at 1.)

Upon arriving at the scene, Champa and Brown walked through the open

front door and encountered the caller, who was sitting on a couch in the living

room and pointed the officers upstairs.  (Ex. A (Champa's Body Cam) at 00:34–

37.)  Before they ascended the stairs, Missoula Police Sgt. Williams, who was

already on the scene, came down the stairs and stated it "looks like this could be an

opioid overdose," then asked Champa to "take a look at the narcotics."  (*Id.* at

1:30–1:40.)  When Champa and Brown entered the upstairs bathroom, paramedics

were tending to Van Pelt, who was laying on the floor, unresponsive.  (*Id.* at 2:00.)

As Champa entered the bathroom he asked, "Where are the narcotics?"  (*Id.*)  In

response, one of the paramedics held up a piece of singed tin foil located near Van

Pelt.  (*Id.* at 2:10; *see also* Doc. 16-3.)

At that point, Van Pelt began coughing and gagging, and while the

paramedics helped him sit up, Champa's body cam shows him scanning a set of

drawers immediately to his left with his flashlight.  (Ex. A at 2:25.)  The footage

shows that Champa scanned over a drawer at hip-height that was open less than an inch, turned in response to a paramedic, and continued scanning.  (*Id.* at 2:28–2:40.)  At the suppression hearing, Champa testified that he had not seen anything while scanning the ajar drawer, and he was looking for anything that might indicate what substance Van Pelt had ingested.

Seconds later, Champa turned around and saw that Brown had opened the drawer that had been slightly ajar.  (*Id.* at 2:59.)  Brown took out a prescription pill bottle and found a loaded firearm in the bottom of the drawer.  (*Id.* at 3:00–3:40.) Champa's police report recorded the discovery as follows: "As I was standing in the bathroom, I observed[] a partially opened drawer.  In the drawer, there was a pill bottle with what appeared to be numerous pills in plastic baggies . . . Officer Brown, observed and made safe a Ruger SR40 Handgun.  (See report by Officer Brown)."  (Doc. 13-1 at 1.)

Brown's body camera begins to record at the moment Champa is looking into the opened drawer.  (Ex. B (Brown's Body Cam) at 0:01.)  Brown recorded the discovery in his police report as follows: "As paramedics were working with Van Pelt, I began to scan the room for weapons or anything that could be used as a make shift weapon . . . A cabinet drawer was partially open and inside I could plainly see a pill bottle with multiple pills inside.  I pulled open the drawer to retrieve the pills and immediately saw a handgun in the bottom of the drawer."

5

(Doc. 13-2 at 1.)  At the suppression hearing, Brown explained that he looked down into the drawer and noticed the white lid of the bottle, so he pulled the drawer open in hopes of identifying whatever substance Van Pelt had ingested as the type and quantity of substance influences the administration of Narcan.

After finding the gun and the pills, the officers identified Van Pelt, who admitted to doing "some kind of oxy."  (Ex. B at 1:24.)  Brown then exited the bathroom, and his body camera captures him talking to Williams.  Brown told Williams they found a gun, and then Champa appeared on-camera and can be heard saying "it was in the open drawer" while also holding up the bottle of pills.  (*Id.* at 2:05–2:16.)  Of note, apart from the pills found in the drawer, Champa also located a small baggie of pills in plain view on the bathroom counter.  (Ex. A at 8:55–9:05; *see also* Doc. 13-1 at 1.)

After the paramedics escorted Van Pelt from the bathroom, the two officers returned to the drawer where the gun and pill bottle were found.  (Ex. B at 7:40.)  Brown's body camera records him saying, "I could see the pill bottle right here," while gesturing at the drawer, "and so I grabbed it and then I saw the gun."  (*Id.* at 7:40–7:45.)  After Brown asked if he should add the bullets at the bottom of the drawer to an evidence bag, Champa said, "Hold on. We'll make this legit legit."  (*Id.* at 8:00; *see also* Ex. A at 11:00.)  Champa's body camera captured him saying, "I mean, it's in plain view, but I'll call real quick."  (Ex. A at 11:05–11:10.)

6

According to Champa's police report, he checked with dispatch and learned that Van Pelt was on felony probation. (Doc. 13-1 at 1.) Champa then called the on-call probation officer, Adam Cole, (*id.*), and explained they were at Van Pelt's house and discovered pills and a firearm, (Ex. A at 11:15–12:15). Champa put Cole on speaker so his body camera recorded Cole giving the officers permission to search Van Pelt's house and personal belongings and to take evidence. (*Id.* at 13:40–13:50.) Beyond finding a piece of mail addressed to "Noah Van Pelt" in the drawer where the pills and firearm were found, the officers did not discover anything else during the search of Van Pelt's residence or belongings. (Doc. 13-1 at 1.)

Nearly three days after the search, on March 10, Van Pelt met with Montana Probation Officer Kristina Datsopoulos, who made digital notes on the meeting. (*See* Doc. 13-4 at 1.) Datsopoulos later sent her notes from the meeting with Van Pelt to the AUSA assigned to this case. (*Id.*) Her notes state, "Discussed sub has lied to me the entirety of his supervision regarding drug involvement. Admits he wasn't truthful when he's told me he had no history. States he has used pills his 'whole life.'" (*Id.*) In addition, in the body of her email but not within her "notes" from the meeting, Datsopoulos stated, "I didn't enter it into my notes however he told me he asked 'a friend' to give him a gun so he had it when he went 'hiking.'" (*Id.*) Datsopoulos subsequently filed a petition to revoke Van Pelt's supervised

release in Montana state court, alleging violations of possession of a controlled substance without a prescription, use of a controlled substance, and possession of a firearm.  (Doc. 13-3 at 3–4.)  In July 2021, Van Pelt was federally indicted on the two present charges.  (Doc. 1.)

## ANALYSIS

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  Thus, "[t]he Fourth Amendment ordinarily requires that police officers get a warrant before entering a home without permission.  But an officer may make a warrantless entry when 'the exigencies of the situation' create a compelling law enforcement need."  *Lange v. California*, 141 S. Ct. 2011, 2016 (2021).  Reasonableness is the "touchstone" of the Fourth Amendment, "determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."  *United States v. Knights*, 534 U.S. 112, 118–19 (2001) (internal quotation marks omitted).  Whether the subject of a search is a probationer "informs both sides of that balance."  *Id.* at 119.

Here, Van Pelt argues the contents of the drawer—namely, the pills, firearm, and ammunition—should be suppressed for two reasons.  First, he argues that the

8

officers had no warrant to search the house, and no exception to the warrant requirement applies.  Second, he argues that the search was not a legitimate "probation search."  The government responds that exceptions to the warrant requirement apply, and even if they did not, the firearm and pills would have been inevitably discovered during a probation search.  Van Pelt also argues that his statement to Datsopoulos should be suppressed, which the government insists is admissible under *Minnesota v. Murphy*, 465 U.S. 420 (1984).  Based on the facts and evidence in this case, the government has the better arguments on both fronts.

## I.    Suppression of the Physical Evidence

"In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."  *Riley v. California*, 573 U.S. 373, 382 (2014).  One such exception is the exigent circumstances exception, which applies when "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable."  *Lange*, 141 S. Ct. at 2017 (internal quotation marks and alteration omitted).  "An officer, for example, may enter a home without a warrant to render emergency assistance to an injured occupant, to protect an occupant for imminent injury, or to ensure his own safety."  *Id.* (internal quotation marks and alteration omitted).  In assessing whether the exception applies, it is necessary to consider the totality of the circumstances facing the officer at the time of the warrantless entry.  *Id.* at 2018.  That

9

requirement dictates that the judge must analyze whether "(1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008).

Here, the government argues that exigent circumstances—namely, the apparent overdose the officers were investigating—justified their initial entry into Van Pelt's home and later the pill bottle seized was in plain view in the ajar drawer. (Doc. 16 at 8–12.) By contrast, Van Pelt argues that the fact of a medical emergency did not give the officer carte blanche to search his home such that the exigent circumstances exception applies, and furthermore the pill bottle was not a plain view discovery. (Doc. 14 at 2–4.) Van Pelt is correct that medical emergencies do not—indeed, should not—give law enforcement officers automatic authorization to perform warrantless searches. While it is well-settled that the exigent circumstances exception to the warrant requirement is implicated when officers must render emergency aid to an injured occupant or to save an occupant from imminent harm, *see, e.g.*, *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); *Kentucky v. King*, 563 U.S. 452, 460 (2011); *Ames v. King Cnty., Washington*, 846 F.3d 340, 350 (9th Cir. 2017), reasonableness defines the bounds of when an exigent circumstance is ongoing versus when it has ended. That

boundary is murky here.

In this case, Champa and Brown were dispatched to the address to investigate a suspected overdose.  (Doc. 13-1 at 1; Doc. 13-2 at 2.)  Champa stated at the suppression hearing that the officers were on-scene for life-saving measures and not for a criminal investigation.  When the officers arrived at the scene, Sgt. Williams explained that the situation appeared to be an opioid overdose and he specifically told Champa "take a look at the narcotics."  (Ex. A at 1:30–1:40.) Neither party offered an explanation as to why Williams, who was already on the scene, could not have investigated the narcotics, particularly given the alleged emergency situation and the presence of paramedics and firemen attending to Van Pelt.  Van Pelt was unresponsive when the Officers Champa and Brown arrived upstairs and, based on the questions flowing between them and paramedics, it was unclear exactly what Van Pelt had ingested.  (*Id.* at 2:00–2:25.)  The search of the drawer occurred within a minute of the officers arriving in the upstairs bathroom and observing Van Pelt, unresponsive on the floor, while the paramedics discussed what he had possibly ingested.  (*See* Ex. A at 2:00–3:00.)  However, Van Pelt regained consciousness while Champa and Brown were checking out the drawers, (*id.* at 2:25), and within another minute Van Pelt was able to identify for the paramedics what he had ingested, (Ex. B at 1:24).  It is difficult to identify where in this factual morass the exigency ended.  It is also impossible to tell from the

body cam footage—which is only available from Champa—whether the slightly open drawer provided a clear line of sight such that the pills were in plain view.

But even assuming no exigency existed when the pills and gun were discovered in the drawer, and that neither item was in plain view, those items will not be suppressed because they would have been inevitably discovered. "The inevitable discovery doctrine applies only when the fact that makes discovery inevitable is born of circumstances other than those brought to light by the illegal search itself." *United States v. Reilly*, 224 F.3d 986, 995 (9th Cir. 2000). The government argues that the discovery of the drugs and the gun were inevitable because of Van Pelt's status as a felony probationer, (Doc. 16 at 12–14), while Van Pelt argues that the government cannot rely on his probationary status to justify the search because the officers were unaware that Van Pelt was on probation when they searched the drawer, (Doc. 14 at 4). Although Van Pelt gets it right that the initial search of the drawer was not a "probationary search," the government correctly argues that the inevitable discovery doctrine applies.

Van Pelt is correct in part; the government cannot justify the opening of the drawer as a "probation search" because such a search requires that the officers know of the subject's probationer status before conducting the search. *See United States v. Caseres*, 533 F.3d 1064, 1075–76 (9th Cir. 2008). The officers did not know Van Pelt was on probation at the time the drawer was opened. But the

12

government does not make that argument.  Instead, the government argues that the

guns and pills would have been discovered even if Brown had not opened the

drawer immediately upon entering the bathroom because Van Pelt's conditions of

supervision authorized warrantless searches of his residence upon a showing of

reasonable suspicion that he had violated the conditions of his release.  Put

differently, Van Pelt's status as a probationer plus the apparent violation of his

conditions of release is a circumstance independent of the search itself that would

have inevitably resulted in the discovery of the contraband.  *See Reilly*, 224 F.3d at

995.

Under paragraph 8 of Van Pelt's conditions of supervised release, a

probation officer "may authorize a law enforcement agency to conduct a search,

provided the . . . officer determines reasonable suspicion exists that the Defendant

has violated the conditions of supervision."  (Doc. 13-5 at 3, ¶ 8.)  Upon learning

that Van Pelt had likely overdosed, Montana probation officer Cole gave the

officers permission to search Van Pelt's home and take evidence.  (Ex. A at 13:40–

13:50.)  Importantly, however, Champa also told Cole that they had found pills and

a firearm at the residence before receiving Cole's permission to search.  (*Id.* at

11:15–12:15.)  The probative inquiry for purposes of inevitable discovery is

whether Cole would have had reasonable suspicion to believe that Van Pelt had

violated the conditions of his release if the officers had not told him about the pills

and gun discovered in the drawer.  He would have. There were illicit drugs found.

Another of Van Pelt's conditions of supervised release requires that he not be in possession of illegal drugs.  (Doc. 13-5 at ¶ 10.)  Apart from the pills found in the drawer, Champa also located a small baggie of pills in plain view on the bathroom counter.  (Ex. A at 8:55–9:05; *see also* Doc. 13-1 at 1.)  Champa found this small baggie of pills before he called Cole and received permission for a probation search.  (Ex. A at 8:55–9:05.)  As a consequence, independent of the contents found in the drawer, Champa told Cole, "There are oxys sitting here, in his bathroom."  (Ex. A at 12:03–12:06.)  The possession of oxycodone without a prescription violated paragraph 10 of Van Pelt's conditions of supervised release, which would have more than satisfied the reasonable suspicion threshold required for Cole to give permission to the officers to search.  (*See* Doc. 13-5 at ¶ 8.)  Unquestionably, the pills and gun in the drawer would inevitably have been discovered during the later authorized probation search.  *See Knights*, 534 U.S. at 121 ("Where an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.").

Accordingly, the physical evidence is admissible.

**II.     Suppression of the Statement**

Van Pelt next argues that his statements to Montana Probation Officer Datsopoulos should be suppressed under the Fifth Amendment, primarily[1] because he effectively had no choice but to incriminate himself given the condition of supervised release that required him to meet with his probation officer within 72 hours of any law enforcement contact and provide truthful answers.  The government claims that this case is on all fours with *Murphy*, and Van Pelt's statements indicating ownership of the pills and the guns are admissible.  The government's legal position is on the mark.

In *Murphy*, the probationer-defendant made incriminating statements to his probation officer and was subsequently indicted.  465 U.S. at 424–25.  He argued that his statements were compelled in violation of the Fifth Amendment, but the Supreme Court disagreed.  The Court explained, "A state may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more does not give rise to a self-executing privilege."  *Id.* at 435.  It concluded, "if the state, either expressly or by implication, asserts that invocation of the privilege [against self-incrimination] would lead to revocation of

_____

[1] In his motion to suppress, Van Pelt argues that his statement should be excluded under the fruit of the poisonous tree doctrine because he was not *Mirandized*. (Doc. 13 at 7.)  Van Pelt did not make this argument in his brief in support of the motion to suppress, and in any event the argument is foreclosed by *Minnesota v. Murphy*, 465 U.S. 420, 433 (1984), which states that, generally, "a probation interview, arranged by appointment at a mutually convenient time" does not constitute a custodial arrest necessitating *Miranda* warnings.

15

probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." *Id.*

Here, there is no indication that Van Pelt was told that invocation of his rights against self-incrimination would lead to revocation.  Van Pelt attempts to argue that the requirement that he "be cooperative and truthful" with the probation officer amounted to compulsion, but the government points out that nowhere do the conditions state or imply that he would be subject to revocation if he invoked his privilege against self-incrimination.  An obligation under the terms of supervision to respond truthfully to questions put forth by a probation officer, without the threat of revocation should the privilege against self-incrimination be invoked, does not compel statements in violation of the Fifth Amendment.  *See United States v. Nieblas*, 115 F.3d 703, 705 (9th Cir. 1997).  As a result, Van Pelt's statements to Datsopoulos are admissible.

## CONCLUSION

For the reasons stated above, IT IS ORDERED that Van Pelt's motion to suppress (Doc. 13) is DENIED.

DATED this 2nd day of November, 2021.

_____
Donald W. Molloy, District Judge
United States District Court

16